**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GENOMMA LAB USA, INC.,                                    :

                                  Plaintiff,              :        MEMORANDUM DECISION
        -against-                                         :             AND ORDER
                                                          :
VENUS AMERICA CORPORATION, PRESTIGE :             14 Civ. 5831 (GBD)
UNIVERSAL MEDIA, LLC and CARLOS                          :
CARRUITERO,                                               :
                                                          :
                                  Defendants.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, District Judge:

    Following a two-week trial in November 2019, Plaintiff Genomma Lab USA, Inc.

("Genomma") won a judgment of $16,683,086 plus interest against Defendant Venus America

Corporation ("Venus"). The judgment has not been fully satisfied, and Genomma seeks to pierce

the corporate veil to hold Defendant Carlos Carruitero ("Carruitero") personally liable for the

judgment against Venus. On October 18 and 19, 2021, this Court held a bench trial to adjudicate

Genomma's veil-piercing claim. Subsequently, both parties filed proposed findings of fact and

conclusions of law.

    This Opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to

Federal Rule of Civil Procedure 52. This Court finds for Genomma on its veil-piercing claim.

Carruitero is personally liable for Genomma's judgment against Venus.

## I.    PROCEDURAL HISTORY

    Genomma commenced the instant action on July 29, 2014, alleging one count of breach of

contract against Venus for Venus's alleged breach of a 2013 advertising services agreement. (ECF

No. 1.) In September 2014, Venus answered Genomma's complaint, alleged a counterclaim for

breach of contract, and filed a third-party complaint for breach of contract against Genomma's

parent company, Genomma Lab Internacional, S.A. de C.V.  (ECF No. 13.)  By Memorandum Decision and Order dated March 26, 2017, this Court granted summary judgment dismissing Venus's third-party complaint.  (ECF No. 207.)  Shortly thereafter, Genomma amended its complaint to assert claims against Defendants Prestige Universal Media ("Prestige Media") and Carruitero under a veil-piercing theory of liability.  (Amended Complaint ("Am. Compl."), ECF No. 211 ¶¶ 26–27.)  Those claims were bifurcated from the breach of contract claims, to be decided only in the event Genomma obtained judgment against Venus.  (ECF No. 255, at 9.)

From November 12 through November 20 of 2019, this Court held a jury trial on Genomma's claim against Venus and Venus's counterclaim against Genomma.  On November 20, 2019, the jury returned a verdict in favor of Genomma on all claims and awarded Genomma damages of $16,683,086 for Venus's breach.  (ECF No. 307.)  On April 7, 2020, this Court entered judgment against Venus in the amount of $26,012,816, representing the verdict of $16,683,086 plus prejudgment interest of $9,329,730.  (ECF No. 335.)  In August 2021, this Court also entered a default judgment against Prestige Media after it failed to appear by counsel in this action.  (ECF No. 369.)

In February 2021, pursuant to this Court's judgment against Venus, the United States Marshal for the Southern District of Florida conducted an execution sale of three Miami properties owned by Venus.  (Transcript of Bench Trial ("Tr.") 51:13–53:12.)  Genomma acquired these properties from the Marshal by credit bids totaling $4,320,000.  (*Id.*)  Accordingly, $21,692,816 of this Court's $26,012,816 judgments against Venus and Prestige Media remains unsatisfied.[1]  Genomma now seeks to pierce the corporate veil and hold Carruitero liable for the remainder of its judgment.

---

[1] According to the evidence provided during trial, Prestige Media has no assets or funds of its own that Genomma might pursue.  (Pl.'s Ex. 123.)

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 52(a) provides, in relevant part, that a court conducting a bench trial "must find the facts specially and state its conclusions of law separately," and that "[j]udgment must be entered under Rule 58." Fed. R. Civ. P. 52(a)(1). Rule 52(a) further provides that such "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6).

## III.    FINDINGS OF FACT

The following section constitutes this Court's Findings of Fact pursuant to Federal Rule of Civil Procedure 52(a)(1).[2] These Findings of Fact are drawn from the testimony at trial and the parties' trial exhibits.

### A.    The Parties and the Nature of Their Dispute

Plaintiff Genomma is the United States operating subsidiary of Genomma Internacional, a Mexico-based distributor of health and beauty products throughout Latin America and the U.S. (Am. Compl. ¶¶ 3, 9.) The Genomma group was founded by Rodrigo Herrera Aspra ("Herrera"), its current chair. (Tr. 16:4–16.) Defendant Carlos Carruitero is a United States citizen domiciled in Miami, Florida. (Am. Compl. ¶ 5.) Carruitero runs Defendant Venus, a corporation formed under the laws of Florida with its principal place of business in Miami. (*Id.* ¶ 4.) Venus's only officers, directors and shareholders are Carruitero's wife, Alejandra Orrego, and her mother, Flor Alba Osorio. (*Id.* ¶ 18.)

On July 3, 2012, Carruitero, acting through Venus, entered into an Advertising Services Agreement with Genomma Internacional. (Tr. 20:17–22; *see generally* Pl.'s Ex. 65, ECF No. 390–

---

[2] To the extent that any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice-versa.

31.)   Pursuant to the agreement, Genomma secured airtime for advertising on Univision's
subnetworks that Venus told Genomma it was able to obtain at more favorable prices. (Tr. 19:11–
16.)   Initially, Genomma and Venus agreed to a short-term "test" that the parties could use to
evaluate whether to continue with a longer relationship—specifically, a three-month purchase of
airtime for $5 million. (*Id.* 20:17–22.) During negotiations, Carruitero represented to Herrera that
he was charging only a standard 15% agency commission on the airtime (*i.e.*, $750,000). (*Id.*
20:17–21:5.)   According to the evidence presented at trial, all negotiations were handled
exclusively by Carruitero, and it was Carruitero who signed the agreement on behalf of Venus.
(Tr. 19:17–20:22; Pl.'s Ex. 65 at 7.)

The initial test was not profitable for Genomma, and the parties agreed to a one-month
extension for an additional $1.67 million. (Tr. 21:6–13; *see generally* Pl.'s Ex. 66, ECF No. 390–
32.)   As before, Carruitero represented that he was charging Genomma only a 15% agency
commission, (Tr. 21:14–19), and again, Carruitero signed this extension agreement on behalf of
Venus, (Pl.'s Ex. 66 at 3).   When the advertising continued to be unprofitable for Genomma,
Herrera proposed a new arrangement through which Carruitero would sell Genomma the airtime
at cost in exchange for 10% of Genomma's net sales in the United States. (Tr. 23:10–21.)
Carruitero accepted, and in late December 2012, Venus and Genomma signed a new Advertising
Services Agreement (the "2013 Agreement"). (*See generally*, Pl.'s Ex. 68, ECF No. 390–33.) As
with the first two agreements, Carruitero negotiated on behalf of Venus and was the sole signatory
for Venus. (*Id.* at 8.)  Pursuant to the agreement, Venus "expressly agree[d] that the rates to be
charged by [Venus] to Genomma as Consideration shall be at value cost, without adding any fee
or other charge." (Pl.'s Ex. 68 at 3.)  In actuality, Carruitero charged Genomma at rates
considerably higher than those agreed to with Univision. (Tr. 24:21–25:24.)  In early 2014,

Genomma spoke to Univision directly and confirmed that Carruitero had been untruthful with Genomma about charging only cost. (*Id.* 25:25–26:12.) Genomma further learned that, as part of his scheme, Carruitero had been providing falsified Univision records to Genomma. Victor Acosta, Carruitero's assistant, testified that he received "post-logs" from Univision listing each Genomma advertising "spot" and the time and date on which it ran. (Acosta Dep. 192:22–25, ECF No. 390–7.) Before these logs were forwarded to Genomma, Acosta—at Carruitero's instruction—altered the spreadsheets by adding a "price" column. (*Id.* at 195:9–196:3.) Carruitero dictated the prices that Acosta inserted for each spot. (*Id.*) In one example, Carruitero instructed Acosta to insert a price of $1,150 for one spot, even though Univision only charged Venus $525 (a 119% markup). (*Id.* at 206:11–207:9.)

Just as to the 2013 Agreement alone, the jury found that Carruitero had overcharged Genomma by more than $16 million. (*Id.* 25:7–12; ECF No. 307.)

## B.   Genomma's Alter-Ego Theory of Liability

This Court's Finding of Facts pertinent to Genomma's veil-piercing claim are as follows. In his testimony before this Court, Carruitero expressly admitted that the advertising arrangements with Genomma were "personal" to him, rather than on behalf of Venus:

Q.  "And 15 percent of $5 million would have been a $750,000 profit to Venus had the Venus side of the equation charged just the 15 percent it promised, correct?"

A.  "First, it was me, it wasn't Venus because I was negotiating on a personal basis."

(Carruitero Dep. 170:2–11, ECF No. 393–3.) Similarly, Carruitero's wife, Alejandra Orrego, who was one of Venus's only two officers, testified that Venus was a conduit through which Carruitero personally sold "his" airtime to Genomma. (Orrego Dep. 30:24–31:3, ECF No. 393–9 ("What I mean is that the advertising is Carlos Carruitero, he gives it to Venus and through the company

Venus the sale is effectuated to Genomma"); *see also id.* at 36:20–22 ("I already told you that Venus's advertising belongs to Mr. Carruitero").)

Neither Orrego nor Venus's other shareholder and officer, Carruitero's mother-in-law Flor Osario, had any insight into the business dealings Carruitero conducted in Venus's name. Carruitero told his wife "nothing" about Venus's business, and Orrego testified that "Carlos is the person in charge" and "the only one who has authority." (*Id.* at 54:7–55:16.) Orrego also vested Carruitero with complete control over any monies that passed through Venus. For example, at Carruitero's direction, Orrego signed more than 50 checks totaling more than $9 million from Venus to Prestige Media, without inquiring as to, or knowing the purpose behind, the transfers. (*Id.* at 41:8–14, 45:14–49:24.) Flor Osorio was less involved than her daughter, testifying that, "with respect to the administration of Venus, in point of fact I know nothing." (Osorio Dep. at 31:16–18, ECF No. 393–10; *see also id.* at 44:11 (testifying, "I don't have the faintest idea" regarding Venus's dealings with Genomma.)

Unsupervised, Carruitero freely effectuated several transactions from Venus to his other companies without consideration. After the parties signed the January 2013 Advertising Services Agreement, for example, Carruitero created a new entity, Prestige Media,[3] which he interposed as an intermediary between Venus and Univision. (Carruitero Dep. 334:9–20, ECF No. 390–4; Carruitero Dep. 62:23–63:21, ECF No. 390–6.) From that point forward, Carruitero instructed Univision to invoice Prestige Media instead of Venus. He then had Prestige Media invoice Venus. Ultimately, Univision charged Prestige Media a total of $6,342,714 for the airtime sold to Genomma. (Pl.'s Ex. 87 at 5–6.) Venus, however, paid Prestige Media a total of $12,599,382.68.

---

[3] Prestige Media conducted no business other than acting as an intermediary between Univision and Venus. (Carruitero Dep. 63:11–20, ECF No. 390–6.)

(Pl.'s Exs. 12, 13, 38, 39, and 123.)  Subtracting Univision's actual price for the airtime, Prestige

Media received \$6,256,668.68 without consideration.[4]  As the sole owner of Prestige Media,

Carruitero diverted the excess monies for his own use.  For example, Prestige Media wrote more

than \$200,000 in checks to the IRS to pay Carruitero's personal tax debts.  (Pl.'s Ex. 15.)  Further

evidence shows that the company was severely undercapitalized: when Carruitero closed Prestige

Media's bank account in December 2019, the balance was \$0.00.  (Pl.'s Ex. 123.)

      Next, on or around August 23, 2013, Carruitero incorporated a new company, Aerolineas

Vive Peru S.A. ("Vive Peru"), in Peru.   (Pl.'s Ex. 22 at 1.)  Carruitero owned 29 of Vive Peru's

30 shares (*i.e.*, 96% of the company).  (Pl.'s Ex. 46 at 40.)  In September and October of 2014,

Carruitero formed two additional companies: Aerexpreso Del Pacifico ("Aexpa"), of which

Carruitero was 90% owner; and Lineas Areas Columbianos LIAR ("LIAR"), of which Carruitero

was 100% owner.  (*Id.* at 28, 34.)  During the same time period, Venus purchased nine aircraft

with a cumulative value of over \$4 million, (Pl.'s Ex. 21; Pl.'s Ex. 25 at 1, 3–4, 10, 14, 25, 32;

Pl.'s Ex. 36 at 3; Pl.'s Ex. 46 at 28, 34), and sold them to Vive Peru, Aexpa and LIAR, (Carruitero

Dep. 103:19–22, ECF No. 390–3).  Despite the existence of significant documentary evidence that

Carruitero was intimately involved in Venus's purchase and transfer of these aircraft to his

Peruvian and Colombian companies, (*see e.g.*, Pl.'s Exs. 10, 24, and 95), Carruitero testified that

he had "nothing to do with" these transactions, (Carruitero Dep. 90:12–104:2, ECF No. 390–3).

      Also in 2013, Venus entered into a shopping center lease agreement to operate a Peruvian

restaurant in the Miami area.  (Pl.'s Ex. 72 ¶¶ 17–18.)  In a declaration he signed in 2017, Carruitero

swore that, after Venus "invested several hundred thousand dollars in making improvements to the

---

[4] While Carruitero claims that the excess funds were payment from Venus to Prestige Media "for the advertising of its retail products," he has not identified any support for his claims.  (Carruitero's Resp. to Pl.'s Proposed Findings of Fact, ECF No. 393, at 6.)  In the absence of evidentiary support, Carruitero's post-trial conclusory arguments are insufficient.

site," the landlord *required* Venus to assign its lease to Kapallaq, a newly-formed company owned by Carruitero and Orrego. (*Id.* ¶¶ 19–20; *see generally* Pl.'s Ex. 147.) Contemporaneous emails contradict this account; in actuality, it was Venus that requested the lease assignment, which a Venus employee assured the landlord was only "for accounting purposes," as "the owner and officials remains [sic] the same." (Pl.'s Ex. 140.) Venus proceeded to pay more than $1.5 million in expenses incurred by Kapallaq and booked these payments as loan receivables that were never repaid. (*See* Pl.'s Exs. 37 at 2; 36 at 2; 35 at 2; 34 at 2; 33 at 2; 32 at 2.)

Other "loans" by Venus to Carruitero remain unexplained. For example, Carruitero testified that he frequently borrowed and loaned money to Venus without documentation, and that as of his August 2021 deposition, "I don't know if I owe it or it owes me." (Carruitero Dep. 133:5– 21, ECF No. 390–3.) Venus's records also show many entries for large, unpaid "loan receivable – others," with no additional information. (*See e.g.*, Pl.'s Ex. 32 at 2.)

Finally, between September 2015 and January 2017, Venus wired a total of $3,000,500 to Nicaraguan bank accounts belonging to an individual named Duilio Leiva and to a company called Agrocasa. (Pl.'s Ex. 72 ¶ 25.) During that same period, Agrocasa wired $1,016,750 back to Venus, resulting in a net gain of $1,988,250 for Agrocasa. (Pl.'s Exs. 52, 53, 129.) According to Carruitero's 2017 declaration, "[i]n December, 2013, Venus entered into an agreement with Agrocasa and its manager, Duilio Leiva, whereby Venus loaned monies to Agrocasa and Mr. Leiva to be used to purchase and deliver to Venus chia, which had begun to become popular as a nutritional 'superfood' in the United States." (Pl.'s Ex. 72 ¶ 25.) Despite this sworn assertion, Carruitero later claimed to have had no involvement in these transactions and no knowledge of the Nicaraguan company on the other side of the transfers. (Carruitero Dep. 37:9-40:17, ECF No. 390–3 ("Q. Do you know what company in Nicaragua sold the chia to Venus? A. Not exactly.").)

8

Documentary evidence shows that Carruitero is the sole owner of Agrocasa, (Pl.'s Ex. 45 at 33), and that he received several emails relating to the chia transactions, (Pl.'s Ex. 11).

## IV.   CONCLUSIONS OF LAW

### A.   Legal Framework for Veil-Piercing

This Court has previously held that Florida law applies to Genomma's veil-piercing claim. *Genomma Lab USA, Inc. v. Carruitero*, 2017 WL 3911035, at \*4 (S.D.N.Y. Aug. 23, 2017). To pierce the corporate veil under Florida law, the plaintiff must prove that "(1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant." *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011) (citation omitted). The key to unlocking the ability to pierce the corporate veil rests in a finding of improper conduct and use of the corporate entity. *See Dania Jai-Alai Palace, Inc.*, 450 So.2d 1114, 1119 (Fla. 1984). Improper conduct, in turn, occurs when the corporate form is used "'to evade some statute or to accomplish some fraud or illegal purpose, or where the corporation was employed by the stockholders for fraudulent or misleading purposes, was organized or used to mislead creditors or to [perpetrate] a fraud upon them, or to evade existing personal liability.'" *Steinhardt v. Banks*, 511 So.2d 336, 339 (Fla. 4th Dist. Ct. App. 1987) (quoting *Tiernan v. Sheldon*, 191 So.2d 87, 89 (Fla. 4th Dist. Ct. App. 1966), cert. discharged, 200 So.2d 183 (Fla. 1967)).

### B.   Facts Established at Trial Satisfy the Veil-Piercing Standard

Applying the foregoing legal framework to the Findings of Fact, Genomma has proven the three elements of control, improper conduct, and causation required for piercing the corporate veil.

First, the evidence indisputably establishes that Carruitero had unbridled discretion with respect to Venus and its business decisions and finances.  As detailed above, Carruitero alone decided and negotiated Venus's business dealings, and he alone controlled Venus's receipt and disbursement of funds.  His relatives, Orrego and Osorio, both testified that Carruitero was the "only one" with real authority over Venus's dealings, and they both admitted that—despite being the sole officers of the company—they had little to no knowledge of Venus's operations.  (*See e.g.*, Orrego Dep. 30:24–31:3, ECF No. 390–9; Osorio Dep. at 31:16–18, ECF No. 390–10.)  Although not determinative, it is not insignificant to the issue of Carruitero's control that Venus's only two officers were his wife and mother-in-law, and that the company's bookkeeper was his sister.

The evidence at trial further established that Carruitero used Venus as a conduit for his own personal business.  Indeed, it is unclear what, if any, business Venus conducted that was not personal to Carruitero.  With respect to the transactions at issue in this case, for example, Carruitero himself admitted that he negotiated with Genomma "on a personal basis" and that "it wasn't Venus."  (Carruitero Dep. 170:2–11, ECF No. 390–3.)  Genomma also furnished considerable evidence that Carruitero and Venus commingled personal and corporate funds and payments of debt. The record reflects that Carruitero withdrew funds from Venus for personal use on multiple occasions—such as, for example, to satisfy his personal tax liabilities, (Pl.'s Ex. 15.)—by first funneling them to another of his entities, Prestige Media.  No credible evidence established that he repaid those funds in whole or in part.  There was also evidence that Carruitero infused personal funds to Venus as "loans" and vice versa, that the terms of these loans were not memorialized in writing, and that the lines eventually became so blurred that it was impossible for Carruitero to determine whether, at present, he owed Venus or Venus owed him.  (Carruitero Dep. 133:5–21,

ECF No. 390–3 ("I don't know if I owe it or it owes me.").)  This admission strengthens the evidence of domination and the absence of arm's length dealing.

With respect to the second and third factors, the evidence establishes that Carruitero used Venus as a vehicle to engage in multiple, improper acts, at least two of which caused significant injury to Genomma.  As the jury found in November of 2019, Carruitero negotiated with Genomma under the false pretenses that he had, initially, been charging only a standard 15% agency commission, and, subsequently, that he was selling Genomma airtime at cost.  (ECF No. 307.) The jury went on to find that Carruitero, through Venus, overcharged Genomma by over $16 million, and awarded Genomma damages in that amount.  (*Id.*)  Further, as noted above, the evidence shows that Carruitero transferred money interchangeably between Venus and his other entities—Prestige Media, Vive Peru, Aexpa, and LIAR, to name a few—at will, without consideration, and with no real purpose.  As Genomma rightly notes in its post-trial submission, Carruitero's dishonest testimony regarding his involvement in these transactions is additional evidence that they were improper.[5]  Finally and in particular, Carruitero's use of Venus as a pass-through to pay his personal bills falls squarely within the realm of misconduct that Florida courts have held sufficient to satisfy the second prong of the veil-piercing analysis.  *See Parrot, Inc. v. NiceStuff Distrib. Int'l, Inc.*, No. 06-61231-CIV, 2009 WL 10739407, at *27 (S.D. Fla. June 15, 2009), report and recommendation approved in part, 2009 WL 10667523 (S.D. Fla. Sept. 4, 2009).

---

[5] With respect to the impropriety of his conduct, Carruitero argues that, "at the time of the filing of the action herein, no evidence" existed that these behaviors were improper, nor had any such finding been "declared." (Carruitero's Proposed Findings of Fact, ECF No. 389, at 10–11.)  What facts had or had not been established or declared at the time Genomma filed the instant action are irrelevant.  Carruitero's other primary argument, that he did not negotiate the Genomma contracts on behalf of himself (*see generally*, Carruitero's Resp. to Pl.'s Proposed Findings of Fact, ECF No. 393), are at odds with his own testimony, (Carruitero Dep. 170:2–11, ECF No. 390–3).

There is ample proof that Carruitero was doing business in his individual capacity to suit his own ends, including by shuttling his own funds in and out without regard to Venus's corporate form. This conduct was improper and injurious to others. This sort of activity "exceeds the limits of the privilege of doing business in a corporate form and warrants the imposition of liability." *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991).

## VI.    CONCLUSION

Defendant Carlos Carruitero is jointly and severally liable for the jury verdict and Judgment against Venus in the amount of $21,692,816, previously entered in this action in favor of Genomma and against Venus.

In accordance with Federal Rule of Civil Procedure 58, this Court shall enter final judgment by separate order.

Dated:  November 10, 2022
         New York, New York

SO ORDERED.

GEORGE B. DANIELS
UNITED STATES DISTRICT JUDGE